**In re: AMTRAK "SUNSET LIMITED" TRAIN CRASH IN BAYOU CANOT, ALABAMA ON SEPTEMBER 22, 1993.**

**This Document Relates to Gary Lee Farmer.**

**No. MDL 1003.**
**Nos. 1:94–5000–RV–C, 1:94–5026–RV–C.**

United States District Court,
S.D. Alabama,
Southern Division.

March 21, 2001.

Lanny S. Vines, Emond & Vines, Birmingham, AL, Gregory B. Breedlove, Mobile, AL, Stephen D. Heninger, James J. Thompson, Jr., Birmingham, AL, Martin H. Levin, Pensacola, FL, Turner W. Branch, Albuquerque, NM, J. Michael Papantonio, Pensacola, FL, L. Andrew Hollis, Jr., Birmingham, AL, Frank Granito, III, New York City, Steven A. Martino, Jackson, Taylor & Martino, Mobile, AL, for Plaintiffs.

Broox G. Holmes, Sr., Mobile, AL, John W. Vardaman, Washington, DC, Jerry A. McDowell, McDowell Knight Roedder & Sledge, L.L.C., Mobile, AL, John P. Coale, Coale, Cooley, Lietz, McInerny & Broadus, Washington, DC, Richard R. Rosenthal, Birmingham, AL, Larry U. Sims, Sims, Graddick & Dodson, P.C., Mobile, AL, James W. Hill, Hirch Robinson, Houston, TX, William E. Andrews, Purvis, MS, for Defendants.

## ORDER NO. 185

VOLLMER, Senior District Judge.

This matter is before the court on the following documents:

1. "Motion to Dismiss Due to Perjury," (doc. 1808 in Master File 1:94–

 5000–RV–C; doc. 139 in Individual File No. 1:94–5026–RV–C), filed by defendants Warrior & Gulf Navigation Company and Willie Odom, together with a supporting brief. (doc. 1809 in Master File 1:94–5000–RV–C; doc. 140 in Individual File No. 1:94–5026–RV–C);[1]

2. First Response, (doc. 1855 in Master File 1:94–5000–RV–C;

 doc. 155 in Individual File No. 1:94–5026–RV–C), filed by plaintiff Gary Lee Farmer;[2]

---

1. The Motion to Dismiss shall be UNSEALED. The supporting memorandum shall remain SEALED.

2. The First Response shall be UNSEALED.

3. Second Response, (doc. 1842 in Master File 1:94–5000–RV–C; doc. 149 in Individual File No. 1:94–5026–RV–C), filed by plaintiff Farmer;[3,4]

4. Reply, (doc. 1844 in Master File 1:94–5000–RV–C; doc. 151 in Individual File No. 1:94–5026–RV–C), filed by defendants WGN and Odom;[5]

5. "Motion to Strike," (doc. 1841 in Master File 1:94–5000–RV–C; doc. 148 in Individual File No. 1:94–5026–RV–C), filed by plaintiff Farmer;[6]

6. Response to Motion to Strike, (doc. 1846 in Master File 1:94–5000–RV–C; doc. 153 in Individual File No. 1:94–5026–RV–C), filed by defendants;[7]

7. "Notice of Filing Affidavit," (doc. 1843 in Master File 1:94–5000–RV–C; doc. 150 in Individual File No. 1:94–5026–RV–C), filed by plaintiff Farmer;[8] and

8. "Motion to Strike Affidavit of Barbara Braddock," (doc. 1845 in Master File 1:94–5000–RV–C; doc. 152 in Individual File No. 1:94–5026–RV–C), filed by defendants WGN and Odom.[9]

## I. The Casualty

In the early morning of September 22, 1993, certain barges in the tow of the M/V MAUVILLA struck the railroad bridge over Bayou Canot (the "Striking"). Defendant WGN owned and operated the M/V MAUVILLA and the tow of barges that struck the bridge. Defendant Odom was the person in charge of the M/V MAUVILLA at the time of the Striking. The bridge and railroad tracks on the bridge were owned by CSX Transportation, Inc.

The Striking displaced the bridge's through-plate girder span and tracks in the westerly (upstream) direction such that the east steel girder of the span was moved into the path of oncoming northbound trains.

Shortly after the Striking, the northbound Sunset Limited (owned and operated by the National Railroad Passenger Corporation (Amtrak)) struck the east girder of the Bayou Canot bridge and derailed at approximately 2:53–2:54 a.m., CDT, on September 22, 1993 (the "Casualty"). Neither Amtrak nor CSX received any warning before the Casualty that the M/V MAUVILLA's tow had struck and displaced the Bayou Canot bridge and tracks. Traveling between 72–74 mph when the Casualty occurred, the Sunset Limited was below the 79 mph speed limit for that class of tracks and that type of train.

---

3. The Second Response and Exhibit Nos. 1 & 2 shall be UNSEALED. Exhibit No. 3 shall remain SEALED.

4. After due consideration of the "Motion for Extension of Time," (doc. 1818 in Master File 1:94–5000–RV–C; doc. 145 in Individual File No. 1:94–5026–RV–C), filed by plaintiff Farmer, and the "Opposition to Motion for Extension of Time," (doc. 1836 in Master File 1:94–5000–RV–C; doc. 147 in Individual File No. 1:94–5026–RV–C), filed by defendants WGN and Odom, it is **ORDERED that the motion for extension is GRANTED to the extent that the affidavit of Barbara Braddock filed on September 19, 2000 is deemed to be filed timely. The motion is DENIED in all other** respects for the reasons set forth in defendants' response.

The Motion for Extension and Opposition thereto shall be UNSEALED.

5. The Reply shall remain SEALED.

6. The Motion to Strike shall be UNSEALED.

7. The Response to Motion to Strike shall be UNSEALED.

8. The Notice of Filing shall be UNSEALED.

9. The Motion to Strike Affidavit shall be UNSEALED.

The train consisted of three locomotives, a baggage car, a crew dormitory car, three passenger coaches, a lounge car, a diner car, and a sleeper car. The locomotives, the baggage car, the crew dormitory car, and two passenger cars derailed into the water of Bayou Canot. One passenger coach, the lounge car, the diner car, and the sleeper car remained on the Bayou Canot bridge and railroad roadbed.

Approximately 50 persons died in the Casualty, some upon impact and some by drowning. The Casualty was the deadliest accident in Amtrak's history.

According to the testimony of plaintiff Gary Farmer, the assistant conductor, he and the conductor were completing paperwork in the diner car located between the passenger cars and the sleeper car at the time of the Casualty.

Plaintiff Farmer testified as to the extent of the impact, how it affected him, how he gave orders to the conductor, and how he (plaintiff Farmer) took charge of the entire rescue operation. Plaintiff Farmer proceeded to participate in the rescue of the passengers.[10]

Plaintiff Farmer seeks to recover damages for past and future mental injuries only. The bulk of his alleged mental injuries arise from Post–Traumatic Stress Disorder (PTSD); he alleges that he is totally disabled by the PTSD he developed as a result of the Casualty.

## II. The Motion to Dismiss

Defendants request that this action be dismissed with prejudice due to fraud perpetrated by plaintiff Farmer on them

and on the court in this litigation. For the following reasons, the court is of the opinion that the motion is due to be granted.

### A. Plaintiff Farmer's Interrogatory Answers

On November 7, 1994, plaintiff Farmer gave the following answers, under oath, to written interrogatories served on him by defendants:

8. **Have you ever pleaded guilty to or been convicted of any crime** punishable by imprisonment in excess of one year, or any crime involving dishonesty or false statement? If so, please state:

(a) The nature of the offense.

(b) The date.

(c) The county and state in which you were tried.

(d) The sentence given you.

**ANSWER: No.**

51. **Have you ever applied for or drawn social security benefits for disability?** If so, state:

(a) The nature and extent of the disability;

(b) The length of time of such disability and the beginning date.

**ANSWER: No.**

53. **Please state whether immediately before the casualty you suffered from any physical aliments or disability.** If so, describe in detail each such ailment or disability.

**ANSWER: None, excellent health.**

Mot. to Dis. Ex. 6 (emphasis added).

Also on November 7, 1994, plaintiff Farmer gave the following answers, under

---

**10.** During the summer of 2000, the court conducted three trials involving five passengers. Mr. Farmer testified in each trial. With each succeeding trial, Mr. Farmer's testimony changed as to his activities following the Casualty – specifically, with each re-telling, his actions became more dramatic and his role more important. Thus, because his three testimonial descriptions contain significant differences, it is not entirely clear what exactly Mr. Farmer did in the aftermath of the Casualty. That said, the passengers' testimony does confirm that Mr. Farmer did actively assist in the rescue of the passengers following the Casualty.

oath, to written interrogatories served on him by co-defendants Amtrak and CSX:

4. **If you have ever been arrested for or convicted of any misdemeanor or felony, state the date of the arrest or conviction,** the location of the arrest or conviction, the case number of the action, the charge or offense involved, the disposition of the case, and the sentence served or fine paid, if any.

ANSWER: No.

5. **Describe in detail your medical history for the past ten years,** including but not limited to the name, address and telephone number of each and every physician, clinic of [sic] hospital or other health care provider who has treated, examined or cared for you, the approximate dates of that treatment, the types of treatment provided, the reasons for that treatment and the medicines prescribed as part of that treatment.

ANSWER: **In the past 10 years, I have enjoyed excellent health with absolutely no medical treatment other than the required company physicals.** Since the time of the derailment, I have been continually treated for Post Traumatic Stress Disorder by Dr. William Osborn at the Sassafras Hill Counseling Center and by Dr. Gary D. Carr at the Oak Grove Clinic in Hattiesburg, Mississippi.

Mot. to Dis. Ex. 6 (emphasis added).

Approximately ten months later, on August 23, 1995, plaintiff Farmer supplemented his answers to defendant WGN's interrogatories:

38. **State the name and address of each health care professional (including hospital) who had provided any examination, treatment or care to you since 1990,** stating the injury or condition for which you were treated.

ANSWER: Dr. Mark S. Seigel, MD Springhill Memorial Hospital 3719 Dauphin Street Mobile, AL 36608

Dr. William T. Osborn Sassafras Hill Counseling Center, Inc. 4824 Old Highway 11 Purvis, MS 39475–9339

Dr. Gary D. Carr, MD Oak Grove Family Clinic 4902 Old Highway 11 Hattiesburg, MS 39402

**For ten years prior to the derailment in September 1993, the Plaintiff has enjoyed excellent health and have [sic] not had any medical treatment or examinations other than company physicals.** On the day of the accident, he was taken to the emergency room of the Springhill Memorial Hospital. He was having mild pain in the left side of his lower back and low abdomen. He had some bumps on his shins. He was discharged on the same day from the emergency room. He has also been treated at the Oak Grove Family Clinic in Hattiesburg, MS by Dr. Gary D. Carr. Furthermore, he has been treated at the Sassafras Hill Counseling Center, Inc. by Dr. William P. Osborn. He has been diagnosed and currently being treated for Post Traumatic Stress Disorder (P.T.S.D.).

Mot. to Dis. Ex. 7 (emphasis added).

As explained below, plaintiff Farmer's answers to the foregoing interrogatories were false.

**B. Plaintiff Farmer's Criminal History**

As evidenced by the certified copies of records obtained from various law enforcement agencies in Florida, plaintiff Farmer was arrested/charged 23 times over a 6–year period (July 1982 – July 1988) for 41 crimes resulting in 20 convictions. Eight of the 20 convictions were felony convictions. As plaintiff Farmer now admits, he

served eighteen months of a 40–month sentence in a Florida penitentiary for at least one of the convictions.

Plaintiff Farmer suggests that he had a "lapse of memory" when he gave the false answers to the interrogatories. Such explanation is incredulous, if only because of the sheer number of felony convictions plaintiff Farmer amassed. However, the suggestion that a person would forget that he had been confined in a state penitentiary for 18 months is even more ludicrous.

### C. Plaintiff Farmer's Health Prior to the Casualty and His Application for Social Security Benefits

Not only were plaintiff Farmer's answers regarding his criminal history perjurious, his statements that he had never applied for social security benefits and that he had "enjoyed excellent health" prior to the 1993 Casualty were also false.

As evidenced by the certified copies of the Social Security Administration (SSA) documents submitted by defendants, plaintiff Farmer applied for benefits in 1987, claiming that he was totally disabled as a result of Post–Traumatic Stress Disorder. He further stated in his Social Security benefits application that he had suffered from PTSD for 11 years, beginning in 1976.

### D. The False Answers Constituted Perjury and Fraud on Defendants and the Court

■■■ For the foregoing reasons, the court concludes that plaintiff Farmer knowingly gave false answers in his answers to interrogatories propounded on him by the defendants in this litigation and that such conduct constituted perjury as well as fraud on the defendants and the court.[11, 12]

### E. Plaintiff Farmer's "Correction" of His False Answers Was Too Little, Too Late

■■ After more than six years of this litigation, plaintiff Farmer served a second

---

11. "A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.* 892 F.2d 1115, 1118 (1st Cir.1989) (citations omitted).

12. As additional support for their motion to dismiss, defendants submitted plaintiff Farmer's 1990 Amtrak employment application (Mot. to Dis. Ex. 4) and his 1995 application for a real estate license in Mississippi. (Mot. to Dis. Ex. 8). In both of these documents, plaintiff Farmer states that he has no prior criminal history. Also, in the Amtrak application, plaintiff Farmer states that he has no "physical, mental, or medical impairment" which would affect his ability to perform the job he sought.
 In the Mississippi real estate license application, plaintiff Farmer answered the question "How long, immediately prior to date of the execution of this application, have you been a resident of Mississippi?" with the statement "28 years." This statement is directly contradicted by plaintiff Farmer's representations in his Amtrak application, wherein he stated that he lived in Maine from March 1988 through the date he completed the Amtrak application (January 11, 1990); that he lived in Florida from June 1984 through February 1988; and that he lived in Georgia from June 1977 through April 1984.

 Plaintiff Farmer requests that the Mississippi real estate license application be stricken on the grounds that it is irrelevant as it is unrelated to this litigation and was not, therefore, produced in discovery. After due consideration, it is **ORDERED that the Motion to Strike Ex. No. 8 to defendants' Motion to Dismiss is DENIED.** Plaintiff Farmer's false answers in the Amtrak application and in the real estate license application are relevant, additional evidence that his answers to defendants' interrogatories were intentional deceptions rather than an innocent "lapse of memory" as suggested by his counsel.

supplemental answer to defendants' interrogatories. On July 26, 2000, plaintiff Farmer admitted for the first time that he had pled guilty to a crime in 1985 or 1986 and that he had filed an application for disability benefits in 1987. Plaintiff Farmer also states in his supplemental answer that it appears that the records of his criminal history no longer exist.

Plaintiff Farmer's attempt to remedy his previous false answers falls so woefully short of the whole truth that the supplemental answer constitutes another fraud on the defendants and the court. Specifically, plaintiff Farmer has yet to acknowledge his entire criminal record in this litigation, and were it not for the thoroughness of defendants' trial preparation, the truth might have never been brought to the attention of the court. Further, although plaintiff represents that he was unable to locate any of his criminal records, defendants have obtained *225 pages* of his records. Additionally, even though plaintiff Farmer finally admitted that he had applied for SSA benefits, he still failed to answer the interrogatory fully, for he failed to state the nature and extent of his alleged disability and the period of time he was so disabled. (Mot. to Dis. Ex. 12). Plaintiff Farmer has yet to identify the psychiatrists and psychologists who diagnosed and treated him during the eleven-year period he had PTSD. Moreover, plaintiff Farmer changed his interrogatory answer regarding the SSA application only after defendants served a copy of the SSA records on his counsel. Finally, plaintiff Farmer served his supplemental answer approximately one week prior to trial, with no explanation why he had not done so much earlier during the course of this 6½-year litigation. This left the defendants virtually no opportunity to conduct any formal discovery on these issues.

## F. The False Supplemental Answer Constituted Perjury and Fraud on Defendants and the Court

For the foregoing reasons, the court concludes that plaintiff Farmer's supplemental answer to the interrogatories propounded on him by defendants in this litigation was so knowingly incomplete and misleading that it constituted perjury as well as fraud on defendants and the court.

## III. Plaintiff Farmer's Response to the Motion to Dismiss

Ninety-five percent of plaintiff Farmer's response to the motion to dismiss consists of picayune and inconsequential arguments. The lack of any substantive response on the merits by plaintiff Farmer underscores the legitimacy of defendants' motion to dismiss.

## A. Plaintiff Farmer's Criminal History

### 1. Arrests v. Charges

First, plaintiff Farmer accuses defendants of "exaggerating the truth" by representing to the court that plaintiff Farmer was arrested on "23 different occasions." In fact, plaintiff Farmer contends, he was only " 'arrested' three, possibly five total times," and that he was "charged" with the other crimes "[w]hile in jail on these [3—5] arrests." (Resp., p. 2).

There is no dispute that plaintiff Farmer was either "arrested" or "charged" on 23 occasions. *See* Mot. to Dis. Ex. 1. This red herring argument over terminology does not alter the fact that plaintiff was formally charged by the State of Florida with 41 felonies and misdemeanors on 23 occasions – and it does not alter the fact that plaintiff Farmer knowingly failed to disclose his admitted "3–5" arrests in his answers to defendants' interrogatories,

much less disclose his admitted 23 "charges" in his answers to Interrogatory No. 4 propounded by co-defendants Amtrak and CSX (which specifically inquired about "the charge or offense involved" in each "arrest."). (Mot. to Dis. Ex. 6).[13]

### 2. When Did Defendants Learn of Plaintiff Farmer's Criminal Record and What was Their Motivation With Respect to Timing?

Plaintiff Farmer's second argument is really no argument at all, but rather an attack on defense counsel's integrity offered in an apparent attempt to divert the court's attention from the *bona fide* perjury and fraud issues at hand. Specifically, plaintiff Farmer makes much ado about defendants' representations regarding the date(s) they discovered plaintiff Farmer's criminal past, and he further challenges defendants' motives behind the timing of their motion to dismiss.

Plaintiff Farmer accuses defense counsel of misleading, if not outright lying, to the court about the date counsel obtained all 225 pages of plaintiff's criminal record. As plaintiff Farmer point out, some of those records bear an April 2000 certification, some bear an August 2000 certification, and some bear both April and August certifications. From this, plaintiff Farmer draws the conclusion that defense counsel actually had all of the documents in April 2000, but had them certified in August 2000 in an effort to mislead the court into believing that defense counsel only learned of plaintiff's criminal history shortly before the August trial date.

As defense counsel explain more fully in the reply, they first learned in February 2000 that plaintiff Farmer had a criminal conviction in Florida. At that time, they instructed their private investigator to con-

tinue his search. Because the investigator had to search by county, the search continued over the course of several weeks. Given that the investigator had to search records in multiple jurisdictions covering a substantial period of time, it is no surprise that the search lasted several weeks. At counsel's request, the investigator was instructed to obtain certified copies in April 2000 for use at trial in June 2000, and to continue his search for additional records. After the court postponed plaintiff Farmer's trial until August 2000 (for reasons unrelated to the issues addressed in this order), defense counsel instructed the investigator to obtain more recent certifications on the records previously certified, and to obtain certified copies of any records not previously certified. As a result, "[t]he investigator obtained new certifications on some of those records, had others re-certified on the same page showing both the April and the August certifications and was unable to have some records re-certified at all." (Reply, p. 5). Upon receiving the complete set of documents on August 3, 2000, defendants immediately forwarded a copied set to plaintiff's counsel. The court finds no fault in defendants' handling of this matter and concludes that defense counsel did not mislead or attempt to mislead it as to the date(s) they learned of plaintiff's 41 crimes and 20 convictions.

 Plaintiff Farmer also questions defense counsel's motive for presenting this information via a motion to dismiss rather than "springing it" on plaintiff during cross-examination at trial. The court finds no fault in defendants' decision to present their evidence of plaintiff Farmer's fraud on them and on the court by way of sealed motion rather than through cross-examination in the joint trial of

---

13. It is ORDERED that plaintiff Farmer's Motion to Strike Exhibit Nos. 1 & 2 (the arrest and conviction summaries) from defen-

dants' Motion to Dismiss is DENIED for the reasons set forth in defendants' response.

plaintiff Farmer and plaintiff Dwight Thompson as originally scheduled. Given the various ways defense counsel could have handled this sensitive and volatile matter, it is clear that they chose the high road, electing to inform the court of plaintiff Farmer's perjurious conduct in a sealed motion, supported with all of the necessary documentation. One of the many benefits of this chosen course was the avoidance of so tainting the trial of co-plaintiff Dwight Thompson that a mistrial would have had to be declared.[14]

### 3. Defendants' Lost Discovery Opportunities

■ Plaintiff Farmer also faults defendants for pointing out that they have not had the opportunity to depose him regarding his criminal history; he implies that defense counsel should have questioned plaintiff about his arrest and conviction record during his deposition, notwithstanding his false interrogatory answers that he had no such record. The court disagrees. A party is entitled to rely on an opposing party's written responses to interrogatory questions; he/she/it is not required to ask a party-deponent every question in his/her deposition that the party had previously answered in the set of interrogatories. Indeed, such a practice would render the interrogatories superfluous and unnecessarily increase the expense of a deposition.

Defendants are not to be penalized for accepting as true plaintiff Farmer's answers to the interrogatories – answers which were made under oath and were plainly responsive. Because of plaintiff Farmer's perjurious answers, defendants were deceived into believing that there was no reason for them to ask him questions about a criminal record during his deposition; his own conduct effectively took away defendants' opportunity to depose him on those issues.[15]

Plaintiff Farmer's failure to disclose timely and completely his criminal record has other, critical ramifications in this action. Plaintiff Farmer's treating psychologist, Dr. William Osborn, testified in his deposition (video-taped for the June 2000 trial on April 18, 2000) that a diagnosis of post traumatic stress disorder was very subjective as its symptoms are elastic and vary from individual to individual. Dr. Osborn further testified that one symptom of plaintiff Farmer's PTSD is his inability to manage his own finances, forcing his mother to take over that aspect of his life following the September 1993 Casualty. According to Dr. Osborn, plaintiff Farmer's inability to retain gainful employment is due in part to this one symptom of his PTSD.

Because plaintiff Farmer knowingly failed to disclose his previous criminal his-

---

14. Plaintiff Farmer suggests that defendants may have falsely dated the certified copies of plaintiff's criminal record. As grounds, they filed the affidavit of Barbara Braddock, the officer who initially certified the copies in April 2000. In her affidavit, Ms. Braddock states that she was on vacation on August 2, 2000, and, therefore, could not have made the August 2000 certification.

In their response, defendants state that although Ms. Braddock did the April 2000 certification, officer Becky Clark did the August 2000 certification. In support thereof, defendants filed a letter from Ms. Clark in which she acknowledges her August 2000 certifica-

tion. As defendants also point out, the August 2000 certification bears Ms. Clark's initials ("BC").

After due consideration, **it is ORDERED that defendants' Motion to Strike Affidavit of Barbara Braddock is DENIED.** That said, the court notes that it accepts defendants' explanation of the two certifications (as supported by Ms. Clark's letter). Therefore, Ms. Braddock's affidavit – which is not inconsistent with Ms. Clark's letter – changes nothing.

15. The same is true as to defendants' lost opportunity to examine plaintiff concerning his mental history.

tory—the vast majority, if not all, of which was for writing bad checks—the defendants were not able to cross-examine Dr. Osborn on the effect on his PTSD diagnosis the fact that plaintiff Farmer had demonstrated an inability to manage his own finances for nearly a decade prior to the Casualty. As defendants note, "Farmer's deliberate and intentional concealment of his obvious inability to handle his personal finances long before the 1993 derailment has denied [defendants] of [their] right to conduct full discovery and have honest and complete information from an opposing party during the course of discovery." (Mot. to Dis., p. 5). Additionally, as evidence by the doctor's notes and records, plaintiff Farmer told Dr. Osborn that he had no history of mental illness or emotional problems. Because defendants did not learn of plaintiff Farmer's SSA application and his claim that he had been totally disabled for 11 years due to PTSD until after Dr. Osborn's video-taped deposition, defendants were denied the opportunity to cross-examine Dr. Osborn on the effect of that information on his diagnosis and treatment. Finally, plaintiff Farmer's false representation that he had no history of mental problems was a major factor (if not the factor) in the defendants' decision not to retain a psychiatric expert by which to challenge plaintiff's PTSD claims.

### B. Plaintiff Farmer's Social Security Benefits Application

#### 1. Evidentiary Challenges

Plaintiff Farmer contends that the statements in his benefits application are hearsay and further states that he only applied for the benefits because he "was desolate and in need of public assistance," having just been released from the "work center" following his 18–month stint in the peni-

tentiary. He also suggests that it was the SSA case worker, not he, who identified his purported disability on the application form as PTSD.

■ These contentions are meritless and/or irrelevant. First, the SSA application—which plaintiff Farmer undisputedly signed—clearly warns the applicant that "anyone who knowingly misrepresents the truth or arranges for someone to knowingly misrepresent the truth is committing a crime which can be punished under Federal law, State law, or both." Additionally, on the first page of the application is the following statement which is adopted by the applicant upon signing: "Everything on this application is the truth as best I/we know it." Moreover, the application contains the following question (located directly above the applicant's signature) which plaintiff Farmer specifically answered in the affirmative: "Do you affirm that all information you have given on this application is true?" (Mot. to Dis. Ex. 3). Thus, whether plaintiff Farmer wrote "Post Traumatic Stress Disorder" as his disability on the application or whether a caseworker wrote it in on the form, Mr. Farmer plainly adopted it as his own answer.[16] As such, it is clearly an admission by a party admissible under Federal Rules of Evidence 801(d)(2) and 803(1) & (3). The records themselves are admissible under Rule 803(6) & (8).

Second, whether any of these documents are admissible at trial and what plaintiff Farmer's motivation was for seeking disability benefits in 1987 is simply irrelevant to the court's inquiry. The question is whether plaintiff Farmer's negative answers to the interrogatory questions regarding application for Social Security benefits were perjurious. Without ques-

---

**16.** In passing, the court notes that it does not take a hand-writing expert to observe that the same person who completed plaintiff Farm-er's SSA application in 1987 was the same person who completed plaintiff Farmer's Amtrak employment application in 1990.

tion, plaintiff Farmer's answers to those interrogatory questions were false, and he knew of the falsity when he gave those answers.

### 2. Dan Kibodeaux's Affidavit and Statement

In support of their motion to dismiss, defendants submitted the affidavit of Dan Kibodeaux, the Assistant District Manager in the office of the Social Security Administration in Hattiesburg, Mississippi, in which he states that the SSA "was unable to locate the medical records portion of Mr. Farmer's file." (Mot. to Dis. Ex. 14). Mr. Kibodeaux also states that after a second request for the medical records portion, the Hattiesburg office was informed by another part of the SSA that the records had been destroyed. Finally, Mr. Kibodeaux states: "If a request had been made for Mr. Farmer's file in late 1995 or early 1996, it is likely that the medical records portion of the file would not have been destroyed and those records would be available for review." *Id.*

Mr. Kibodeaux's affidavit was drafted by one of the defense attorneys following their telephone conversation(s) regarding plaintiff Farmer's file. Counsel mailed the affidavit to Mr. Kibodeaux, who executed it and returned it without making any changes or expressing any reservations to defense counsel about its contents.

Counsel for plaintiff Farmer subsequently met with Mr. Kibodeaux in person and took his sworn statement for purposes of responding to the motion to dismiss.

### a. Lost or Destroyed?

■ In his statement, Mr. Kibodeaux clarified his affidavit representation regarding the second search, saying that the Baltimore office of the SSA reported that the medical records portion of the file had been either destroyed or lost. Based on this clarification, plaintiff's counsel accuses

defense counsel of knowingly drafting an affidavit containing a false statement (*i.e.,* stating that the medical records portion was destroyed without mentioning the possibility that it was lost).

The distinction plaintiff Farmer draws is one without a difference, for it makes no difference whether the medical records portion was lost or destroyed – either way, it is equally unavailable for defendants to examine. Plaintiff's counsel's accusation that defense counsel suborned perjury on this matter is totally unfounded.

### b. Was There Ever a Medical Records Portion in Plaintiff Farmer's SSA File? and SSA's Records Retention Policy

Plaintiff's counsel again accuses defense counsel of "subourning [sic] false and misleading testimony," (Resp. p. 9), by not including in Mr. Kibodeaux' affidavit (1) the fact that he had no personal knowledge of whether a medical records portion ever existed as part of plaintiff Farmer's SSA file (Resp.Ex. 3, pp. 26–27) and (2) the fact that the SSA's record retention policy permits a file regarding disability benefits to be destroyed after five years (beginning from the date of the denial).

### (1). Mr. Kibodeaux's Lack of Personal Knowledge of the Medical Records Portion of Plaintiff Farmer's SSA File

Mr. Kibodeaux's affidavit is not misleading as to whether he had personal knowledge of the medical records in plaintiff Farmer's SSA file; it is clear that he did not. Plaintiff's counsel takes Mr. Kibodeaux's lack of personal knowledge a step further and suggests that there might not have ever been a medical records portion. (Resp. p. 14 – "[T]he only thing clear is that ... no one can state more likely than not that there were any medical records

contained in this file that can no longer be produced."). This suggestion is fully rebutted by Mr. Kibodeaux's statement taken by plaintiff's counsel, as well as by the SSA documents. Mr. Kibodeaux testified that a SSA disability benefits decision would be based on the medical records obtained from the applicant and the medical sources identified by the applicant. (Resp., Ex. 3, p. 19). If those medical records were not available or were insufficient, the SSA would send the applicant to "an outside physician for an examination." Thus, the SSA would either obtain medical records already existing based on previous examinations by the applicant's treating physicians or obtain medical records by having an outside physician create them based on an examination given for the purpose of the benefits determination. Whichever is the case, it is clear from Mr. Kibodeaux's statement that the SSA considers medical records when it makes its decision; conversely, the agency does not make a benefits decision without supporting medical records.

Additionally, two items of information in plaintiff Farmer's SSA documents indicate that medical records were actually considered in his case. The "Disability Determination and Transmittal" form (Form SSA–831–U5) (Mot. to Dis., Ex. 3, p. 6) was signed off by Steven D. Dobbs, who, according to Mr. Kibodeaux, is a clinical psychologist. First, if there were no medical records under consideration, review of the SSA application by a clinical psychologist would not be necessary. Second, the DDT form shows that plaintiff Farmer was diagnosed as having a specific mental disorder.[17] This is clearly a medical diagnosis for which medical records would have been generated. Third, according to Mr. Kibodeaux, plaintiff Farmer's application was denied even though he was diagnosed with this mental disorder because it was

determined that the illness would not disable plaintiff for the twelve month minimum required to qualify for benefits. Again, such a determination must have been made by a psychologist or psychiatrist with medical records having been generated in the process. For the foregoing reasons, the court concludes that there was a medical records portion in plaintiff Farmer's SSA file that is now unavailable for discovery in this litigation.

**(2). SSA's Records Retention Policy**

Plaintiff's counsel also takes defense counsel to task for Mr. Kibodeaux's affidavit representation that it was likely the medical records portions would have been available for review in late 1995 or early 1996. As grounds, plaintiff Farmer notes that the SSA record retention policy for denied disability claims is five years from the date of the denial. Because plaintiff Farmer's SSA application was denied on January 21, 1988, the last date the records were required to be retained was January 21, 1993 – seven months before the Casualty.

The record does not contain any evidence as to how quickly the SSA destroys records once the applicable retention period has run, and the agency apparently keeps no record of the date it destroys a record. For that reason, the court cannot determine with certainty if the medical records portion of plaintiff Farmer's SSA application would have been available for discovery had he been truthful in his interrogatory answers in 1994. But of this the court is certain: plaintiff Farmer has still failed to identify to defendants any of the psychiatrists or psychologists who diagnosed and/or treated him during the 11–year period he suffered from PTSD, and he has still failed to identify to defendants the psychiatrist or psychologist who diag-

---

**17.** This disorder was not PTSD.

nosed him with the specific mental disorder identified by the SSA on the DDT as its "primary diagnosis." It is uniquely within plaintiff Farmer's ability to identify to defendants the diagnosing and/or treating doctors upon whose medical records the SSA relied when it made its benefits decision, yet he continues to withhold that information, hiding instead behind the argument that "no one from the Social Security office can testify that more likely than not had a request been made in late 1995 or early 1996, that the medical records portion of this file would not have been destroyed and those records would have been available for review." (Resp. p. 14).[18] Without knowing how quickly the SSA destroys records in 1993 after the retention period expires, it is reasonable to conclude that the medical records portion was more likely to exist in late 1995 or early 1996 than in mid–2000. In any event, plaintiff Farmer's conduct created the impossibility of knowing if the documents still existed in late 1995 or early 1996.

### c. Whether the Defendants' Certified Copy of Plaintiff Farmer's SSA File is Complete

When plaintiff's counsel took Mr. Kibodeaux' statement, Mr. Kibodeaux produced four documents from plaintiff Farmer's SSA file which had not been included in the copy of his SSA file submitted by defendants in support of their motion to dismiss. From this, plaintiff's counsel at-

tributes to defense counsel an intent to mislead the court. This argument merits little discussion.

First, the set of documents from plaintiff Farmer's SSA file submitted by defendants was certified by SSA Claims Development Clerk Shelly Bowman and identified by her as true and correct copies of the original record. (Mot. to Dis. Ex. 3). This certification was authenticated by Mr. Kibodeaux. *Id.* If the set is in fact incomplete, it is not the fault – much less the unethical design – of defense counsel.

Second, the court has reviewed the four documents which Mr. Kibodeaux now states are part of plaintiff Farmer's SSA file which were not included in the set certified by Ms. Bowman. (Resp.Ex. 3, Depo.Ex. 4). These documents contain no information that is material to the issues before the court.[19, 20]

## IV. Legal Analysis

### A. Authority to Impose Sanctions

■ There is no question but that the court has the authority to impose sanctions, including dismissal of a case based on plaintiff's abuse of the judicial process.

It is well established that the district court has the authority to dismiss or to enter default judgment, depending on which party is at fault, for failure to prosecute with reasonable diligence or to comply with its orders or rules of proce-

---

18. Plaintiff Farmer requests that Mr. Kibodeaux's affidavit be stricken because it "contains false, misleading, and incomplete testimony." After due consideration, **it is ORDERED that the Motion to Strike Exhibit No. 14 from defendants' Motion to Dismiss is DENIED for the reasons set forth in defendants' response.** The court concludes that Mr. Kibodeaux's affidavit and statement are, with one exception, complementarily consistent. The only possible inconsistency is Mr. Kibodeaux' apparent retraction of his "likely" statement in the

affidavit. The court has taken Mr. Kibodeaux's later interpretation into account.

19. The court notes that two of the documents contain multiple codes which presumably have meaning to SSA personnel. Plaintiff Farmer has submitted no explanation of these codes, rendering them useless in this forum.

20. **It is ORDERED that plaintiff Farmer's Motion to Strike Exhibit No. 3 from defendants' Motion to Dismiss is DENIED for the reasons set forth above.**

dure. While the authority is reiterated in some of the Federal Rules of Civil Procedure for particular situations, the power is one inherent in the courts "in the interest of the orderly administration of justice." It may be exercised sua sponte under proper circumstances. The exercise of the authority is discretionary, and is subject to review for abuse of discretion. Dismissal of an action with prejudice and entry of judgment by default are drastic remedies which should be used only in extreme situations, as the court has a wide range of lesser sanctions.

*Flaksa v. Little River Marine Construction Co.,* 389 F.2d 885, 887–88 (5th Cir.), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968) (footnotes and citations omitted).[21]

The Court of Appeals for the Eleventh Circuit continues to follow *Flaksa:*

Apart from Rule 11, this court has previously recognized the inherent power of a court to impose reasonable and appropriate sanctions upon counsel for abusive litigation practices or for violations of procedural rules or court orders. *See, e.g., Carlucci v. Piper Aircraft Corp., Inc.,* 775 F.2d 1440, 1447 (11th Cir.1985); *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1208–11 (11th Cir.1985); *Flaksa v. Little River Marine Construction Co.,* 389 F.2d 885, 888 & n. 10 (5th Cir.), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968); *Woodham v. American Cystoscope Company of Pelham, N.Y.,* 335 F.2d 551, 557 & n. 15 (5th Cir.1964). The court has the power either to dismiss a case with prejudice or to enter a default judgment for failure to prosecute with reasonable diligence or for failure to comply with court orders or rules of

procedure. *Flaksa,* 389 F.2d at 887; *see also Link v. Wabash Railroad Co.,* 370 U.S. 626, 629–33, 82 S.Ct. 1386, 1388–90, 8 L.Ed.2d 734 (1962).

*Donaldson v. Clark,* 819 F.2d 1551, 1557 n. 6 (11th Cir.1987).

Just over a year ago, the Eleventh Circuit reaffirmed

"the strong interests that a court has in protecting itself from abusive, contumacious conduct. Sanctions, including dismissal or issuance of a default judgment, must be available to protect the ability of district courts to police discovery simply and speedily." *Phipps v. Blakeney,* 8 F.3d 788, 790 (11th Cir.1993). "No litigant and no attorney, even if motivated by misguided perceptions of constitutional [or statutory] privilege, may be permitted to exhibit ... contumacious conduct without risk of sanctions under [Federal] Rule [of Civil Procedure] 37 [or Rule 41(b) ]." *Adolph Coors Co. v. Movement Against Racism and the Klan,* 777 F.2d 1538, 1543 (11th Cir. 1985).

*Beck v. Bassett, (In re Southeast Banking Corp.),* 204 F.3d 1322, 1335 (11th Cir.2000) (first and second brackets added).

Not surprisingly, the Eleventh Circuit decisions are consistent with a number of sanction decisions issued by the United States Supreme Court confirming a lower court's authority to impose sanctions under Federal Rules of Civil Procedure 11, 37, and 41(b), Title 28 U.S.C. § 1927, and the "inherent power" of the court. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (Rule 11, 28 U.S.C. § 1927, and inherent power); *Roadway Express v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (In previous cases, this Court recog-

---

**21.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), the Court of Appeals for the Eleventh Circuit adopted as precedent all

of the decisions of the former Court of Appeals for the Fifth Circuit decided prior to October 1, 1981.

nized the 'well-acknowledged' inherent power of a court to levy sanctions in response to abusive litigation practices.); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (Rule 37 and Rule 41(b)); *Link v. Wabash R. Co.*, 370 U.S. 626, 632, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962) (Rule 41(b)).[22]

Although plaintiff Farmer's perjurious interrogatory answers are likely covered by Rule 11,[23] his failure to supplement those answers with truthful, complete answers violates Rule 26(e); therefore, Rule 11 is insufficient to sanction plaintiff Farmer for all of his conduct. Additionally, plaintiff Farmer's acts do not nicely fall within Rule 37's ambit of sanctionable conduct because his perjury was not done directly in violation of a court order regarding discovery; therefore, Rule 37 is insufficient to sanction plaintiff Farmer for all of his conduct. For similar reasons, it appears that Rule 41(b) does not cover the situation before the court and is, therefore, an insufficient sanction mechanism. Title 28 U.S.C. § 1927 (governing counsel's liability for excessive costs) is inapplicable. Accordingly, the court concludes that its authority to impose sanctions in this case falls within the court's "inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal," *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980)), for "[a]t the very least, the inherent power ... exist[s] to fill in the interstices [between the other sanctioning mechanisms]." *Chambers v. NASCO, Inc.*, 501 U.S. at 46, 111 S.Ct. at 2134.[24]

## B. Factors Considered

■ Neither the Supreme Court nor the Eleventh Circuit has established a spe-

**22.** This list of Supreme Court cases addressing sanction issues is non-exhaustive.

**23.** The court uses the qualifier "likely" because the court is of the opinion that Rule 11 attaches to all persons who sign pleadings and "other papers." However, on its face, Rule 11 applies only to attorneys and unrepresented parties, and plaintiff Farmer has been represented by counsel throughout this lengthy litigation.

**24.** There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. This is plainly the case where the conduct at issue is not covered by one of the other sanctioning mechanisms. But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute [28 U.S.C. § 1927] or the Rules.... [W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

\* \* \* \* \* \*

It is true that the District Court could have employed Rule 11 to sanction Chambers [the party plaintiff] for filing "false and frivolous pleadings," ... and that some of the other conduct might have been reached through the other Rules. Much of the bad-faith conduct by Chambers, however, was beyond the reach of the Rules; his entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address. In circumstances such as these[, the court's invocation of its inherent power is justified]. *Chambers*, 501 U.S. at 50–51, 111 S.Ct. at 2135–36.

cific test for district courts to utilize when faced with the question of whether a dismissal with prejudice is the appropriate sanction for a plaintiff who has committed fraud on a defendant and on the court. However, as defendants set forth in their reply brief, there are a number of factors which courts have considered: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the centrality of the fraud to the matters at issue in the litigation; (4) the culpability of the litigant and whether his actions were willful, intentional or in bad faith; (5) the due process/warning given to the offending party that dismissal of the action would be a likely sanction; (6) the efficacy of lesser sanctions; and (7) the public interest in the integrity of the judicial system. *Archibeque v. Atchison, Topeka, and Santa Fe Railway Co.*, 70 F.3d 1172, 1174 (10th Cir.1995). *See generally, Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Roadway Express v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Gratton v. Great American Communications*, 178 F.3d 1373 (11th Cir.1999); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir.1989); *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1023 (8th Cir.1999).

### 1. Prejudice to Defendants WGN and Odom

 Without question, defendants have been prejudiced by the multiple instances of perjury committed by plaintiff Farmer and his continued failure to answer those interrogatories completely. Defendants relied, to their detriment, on plaintiff Farmer's interrogatory answers that he had been in excellent health prior to the Casualty and that, concomitantly, he had

never filed a claim for Social Security benefits. Defendants' decision not to retain an psychiatric expert to challenge the conclusion of plaintiff's expert that Mr. Farmer was totally disabled by the PTSD caused by the Casualty was based in large measure, if not entirely, on his false representations regarding his health. Plaintiff Farmer's failure to disclose his numerous criminal convictions for bad checks also prejudiced defendants in that they were unable to challenge plaintiff's treating psychologist's reliance on plaintiff's inability to handle his financial affairs as a symptom of his alleged PTSD. Defendants were also unable to cross-examine plaintiff Farmer's expert on how his diagnosis would have been affected by the knowledge that plaintiff had lied to him about his mental health history; that plaintiff had suffered from PTSD since 1976; and that the SSA had determined that he had another psychological disorder in 1987. Plaintiff's expert's deposition was video-taped for trial shortly before defendants obtained the SSA records. Moreover, plaintiff's perjurious conduct continued for approximately six years. Indeed, as noted above, plaintiff Farmer has yet "to come clean" with respect to his false interrogatory answers. Defendants have surely been prejudiced by such conduct in that they have not been allowed to defend this action on a level playing field.

### 2. Interference With the Judicial Process

There is no doubt that plaintiff Farmer's conduct interfered with the judicial process. As defendants note, the "judicial process" clearly includes a party's right to full, complete, and truthful discovery. Plaintiff Farmer's false answers to multiple interrogatories denied all of the defendants that right. Defendants properly served interrogatories on plaintiff Farmer,

and plaintiff Farmer intentionally interfered with the judicial process and committed fraud on the court by deliberating selecting which interrogatories he would answer truthfully. Because plaintiff Farmer's mental health was the key issue to be tried in this case, because plaintiff Farmer gave false answers to the interrogatories directed to his mental health history, and because he lied about his criminal record and mental health history on other occasions (*e.g.*, Amtrak employment application and Mississippi real estate license), it would be virtually impossible for a jury to determine the truth behind plaintiff Farmer's mental health.

### 3. Centrality of the Fraud

The court has already noted that plaintiff Farmer's perjurious answers as to his mental health went to the core issue to be tried. Clearly, plaintiff Farmer's failure to disclose his prior disability resulting from PTSD in 1987 is central to the issue of whether he suffers from PTSD as a result of the Casualty in 1993.

### 4. Culpability of the Litigant and His Intent

There is no evidence that plaintiff Farmer's false interrogatory answers and his failure to supplement them with true and correct answers was the result of any act or suggestion of his attorneys. Rather, all of the evidence indicates that plaintiff Farmer lied to everyone about his criminal record and mental health history – his attorneys, his treating psychologist, defendants, the court, and third parties. Plaintiff Farmer is solely culpable for the fraud wrought on defendants and the court, and his conduct was unequivocally intentional.

### 5. Due Process/Warning of the Possible Sanction of Dismissal

Of course, the first warning that this action might be dismissed as a sanction was given by the service of defendants' motion to dismiss. The second, and more important, warning came from the court directly, when it held an in-chambers preliminary hearing on August 11, 2000. The court made it clear to counsel for plaintiff Farmer that it was seriously considering granting the motion to dismiss and dismissing plaintiff's case. Additionally, the court gave plaintiff Farmer 30 days to marshal his response. Although the court also advised counsel for plaintiff that he would permit them to withdraw, they elected not to, so plaintiff was fully represented by knowledgeable counsel in the preparation of his response. This satisfies plaintiff Farmer's due process rights.[25]

### 6. The Efficacy of Other, Lesser Sanctions

The court is fully cognizant that dismissal with prejudice is a drastic sanction to be imposed only when other, lesser sanctions will not suffice. After full and long consideration, the court concludes without reservation that no sanction short of dismissal would do justice in this case. As plaintiff Farmer's response to the motion to dismiss aptly demonstrates, he still fails to acknowledge the scope of his willful conduct, and he still fails to grasp the seriousness of his perjury. He has yet to provide defendants with full and truthful answers to the interrogatories at issue. Further, as noted above, these matters go to the heart of the triable issues in this case. If the court were to impose any lesser sanction and thereby permit plaintiff Farmer to have a trial, the costs to defendants –

---

**25.** "Due process is satisfied if the sanctioned · party has a real and full opportunity to explain its questionable conduct before sanctions are imposed." *Chrysler Corp. v. Carey,* ‘ 186 F.3d 1016, 1023 (8th Cir.1999).

totally innocent of any judicial wrongdoing – would be tremendous. At the very least, discovery would have to be reopened, new experts retained, some depositions taken anew and some depositions taken again, and interrogatories answered yet again. Defendants and their counsel, who have handled more than six grueling years of this MDL litigation in a manner speaking well of the legal profession, should not be forced to engage in another year of discovery for which they cannot recover their expenses.[26]

### 7. Public Interest in the Integrity of the Judicial System

Had plaintiff Farmer's wrongful conduct been minor and non-merit related for which a lesser sanction would suffice, the integrity of the judicial system would not be substantially threatened; but that is not the situation before the court. Plaintiff Farmer's acts of perjury seriously undermine the very core of the judicial system. The presence of perjury in litigation emasculates justice and deprives the opposing party of a fair trial. The public interest in the integrity of the judicial system is preserved by the dismissal with prejudice of plaintiff's claims.

### C. Other Perjury Cases

Although there are numerous published cases dealing with the issue of dismissal as a sanction, three are particularly instructive, as they involve parties who committed perjury during the discovery process.

In *Archibeque v. Atchison, Topeka, and Santa Fe Railway Co.,* 70 F.3d 1172, 1174 (10th Cir.1995), the plaintiff sued her employer for lower back injuries she allegedly sustained in a work place accident in December 1990. In her response to interrogatories regarding her physical health, plaintiff omitted any mention of lower back or tailbone injuries prior to 1990. In response to a production of documents request, plaintiff produced medical records and represented in writing that the records were complete. In her deposition, plaintiff testified that she did not recall any lower back pain prior to December 1990.

During its own investigation, the defendant employer learned that the plaintiff had repeatedly "sought and received medical treatment for lower back and tailbone pain ... on over fifteen occasions, involving at least six physicians" "for over ten years prior to the alleged December 1990 accident." *Id.* at 1173. After the defendant brought this information to the attention of the court by way of a motion to dismiss, plaintiff claimed her failure to disclose this information was an oversight, but offered no plausible explanation for her conduct.

The district court dismissed the case as a sanction for the plaintiff's perjured testimony and intentional concealment of her medical history. The Court of Appeals for the Tenth Circuit affirmed the dismissal, noting the "egregious nature of [the plaintiff's] conduct." *Id.* at 1175.

In *Pope v. Federal Express Corp.,* 974 F.2d 982 (8th Cir.1992), the plaintiff manufactured a document from her supervisor containing a message with sexual overtones and submitted it as evidence during her Title VII sexual harassment suit against her supervisor and employer. Additionally, the plaintiff testified about the document during her deposition.

After determining that the document had been fabricated and that the plaintiff

---

**26.** It is the court's understanding that plaintiff Farmer does not have the financial resources to pay the costs and expenses of the additional discovery which would be necessary if this case were permitted to proceed.

knew of its fabrication when she submitted it in discovery and testified about it in her deposition, the district court dismissed the case as a sanction. The Court of Appeals for the Eighth Circuit affirmed the dismissal, noting the lower court's finding that the plaintiff had "manufactured evidence and [given] perjured testimony ... in an attempt to enhance the case through fraudulent conduct." *Id.* at 984.

In *TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915 (9th Cir.1987), the defendant was sued for RICO and securities fraud based on his alleged diversion of the corporate plaintiff's funds. During his depositions, the defendant admitted his role in the fund diversion but created, from whole cloth, a story involving a "pseudo-gambling scheme" conducted at the direction of the corporate plaintiff's president which allegedly resulted in the diversion of the corporate funds. *Id.* at 916. As the court noted, this testimony forced "[m]uch of the energies of [the plaintiff corporation and the plaintiff shareholders] in preparing their case for trial [to be] diverted to disproving these allegations [against its president]." *Id.*

On the day of trial, the defendant admitted the pseudo-gambling scheme story was false, created by him to conceal the fact that he had lost the corporate plaintiff's funds by his own gambling without any involvement of the corporate plaintiff's president. On plaintiffs' motion, the district court sanctioned the defendant by striking his answer and entering a default judgment against him.

On appeal, the Court of Appeals for the Ninth Circuit affirmed the district court's handling of the matter and rejected the defendant's argument that "his belated candor should be rewarded" with a sanction less severe than a default judgment: "[The defendant's] elaborate scheme involving perjury clearly qualifies as a willful deceit of the court. Although the perjury occurred before the trial began, it infected all of the pretrial procedures and interfered egregiously with the court's administration of justice.... [Moreover, his recantation] statement, perhaps the only candid one he makes, reveals that his perjury and the recanting were both orchestrated to reap a tactical advantage." *Id.* at 917.

As these three cases illustrate, a party's infusion of perjury into the pretrial proceedings in an effort to gain an advantage over his opponent is recognized by the courts as a fraud on the court warranting the dismissal of a plaintiff's case or the entry of a default judgment against a defendant.

## V. Conclusion

The court has been involved in this Amtrak litigation since 1993. The attorneys for the parties have worked long and hard to resolve most of the issues raised; their efforts resulted in the settlement of the vast majority of the individual cases. The court has issued over 100 substantial orders and has spent an inordinate amount of time disposing of all of these Multi-District Litigation cases. Mr. Farmer's case was not resolved long before this date because of the many legal issues that had to be decided and because settlement negotiations were going forward in all of the cases, including plaintiff Farmer's. But for the fact that this litigation was so extensive, plaintiff Farmer would have had his case tried before the defendants were able to garner the information necessary to prevent a travesty of justice.

Although plaintiff Farmer was involved in this train wreck, the car on which he was riding did not derail, and he claims no injuries other than mental and emotional. Even though his description of the activities he undertook in assisting the passen-

gers who were in Bayou Canot have not been refuted (*but see* footnote 10), the fact that plaintiff Farmer was not truthful in his answers to interrogatories raises serious questions as to the truthfulness of his testimony relating to this incident. If this case was tried, the defendants would certainly be entitled to investigate and depose witnesses concerning plaintiff Farmer's actual conduct immediately following the derailment. The fact that plaintiff Farmer's intentional conduct would require this additional discovery (as well as that discovery identified *infra*) were this case to be presented to a jury also adds to the bases for a dismissal of the lawsuit. The court does not question that the plaintiff was involved in this train wreck through no fault of his own, and the defendants have agreed to try the case relating to the plaintiff's injuries without liability as an issue. The question comes down to what mental and emotional injuries plaintiff Farmer has sustained in this event. Considering the testimony of plaintiff Farmer, which was not truthful, the court does not believe any jury can decipher whether plaintiff's claims are in fact caused by this incident or whether they are trumped up as a result of his hope for financial gain. Plaintiff Farmer's fraud on the court, as well as on the defendants, causes the court to determine dismissal is the only proper sanction and to conclude further that plaintiff is solely responsible for the court's decision.

The court is of the opinion that no sanctions, including monetary sanctions against plaintiff Farmer, are adequate to remedy the activities engaged in by plaintiff Farmer. For the foregoing reasons, **it is**

**ORDERED that defendants' Motion to Dismiss is GRANTED. This action is DISMISSED WITH PREJUDICE,** as the court concludes that the only appropriate sanction for plaintiff Farmer's per-

jurious conduct under the circumstances of the case is a dismissal of the action.

The Clerk is DIRECTED to send a copy of this order to counsel by facsimile in lieu of mail.